Good morning, my name is Robert Goslink. I represent Appellant Gallant Ocean, a producer and exporter of merchandise subject to the anti-dumping duty order on shrimp from Thailand. The issue in this case is whether the Commerce Department sufficiently corroborated the adverse facts failable anti-dumping duty margin that it assigned to Gallant Ocean. Why would they go to the Japanese market? Why would they go to the Japanese market? I'm sorry, I don't. Well, if I'm correct, the figures they come up with for their constructive value come from Japan. I can't see a much larger market difference than Thailand and Japan. Japan has the highest seafood prices probably in the world, but comparing Thailand to Japan seems like an outrageous jump. My understanding, Your Honor, is that there are, at that time when the petition was first filed, there were very few sales of shrimp in Thailand. Well, frozen shrimp. I'm sure there are lots of most of the market was sort of export oriented, and thus they had no other option but to use a third country market for purposes of- But why Japan? That's the most expensive market in the world. The petitioner has the right to choose the rates and the comparisons that it would like to bring to the department's attention in terms of initiating the cases. Did you object to that? We were not involved in the case at that time, and typically respondents do not get to say anything with regard to the initiation of anti-dumping cases other than whether or not the petitioners have standing to file the case in the first place. Another thing that bothered me is the comparison to broken shrimp. Broken shrimp has to have a vastly lower price even in the Thai market. In fact, that is the main concern of our argument and the one specific point that I'd like to focus on in this morning's- How do we know you weren't dumping broken shrimp? You didn't participate, so we don't know that you weren't dumping broken shrimp because both are covered by the duty order. Both are covered by the duty order, but the point in this case is not what products Gallant Ocean sold to the United States. I submit to you that that issue is completely irrelevant. The issue really is whether or not the sales that Commerce used to corroborate the petition rate were sufficiently corroborated. What Gallant sold or did not sell, or how much they didn't sell, is really irrelevant to whether or not the petition rate that Commerce used was sufficiently and adequately corroborated by the specific transaction margins that it looked at for the mandatory respondents in that particular review. That is really the issue that I'd like to focus on, the issue of representativeness. Throughout this proceeding, Commerce has claimed that the sales it chose for corroboration purposes were representative of the sales used by the three mandatory respondents. Of the thousands and thousands and thousands of sales that PacFood made, only a handful, only a fraction, were sales of what the court and parties in the briefs have referred to as product A sales. Just so I know for confidentiality, so I don't blurt out the wrong thing here, is the rate that was put against you, the specific number, that's not confidential. That's not confidential. Right, 57%. The 57.64% rate is the rate from the original petition. I saw in brackets, I think, some of the numbers you're talking about, so I can't be too specific, I understand. It's true, we're comparing that to a rate of 3% to 10% or so for the people who cooperated. Correct. The three mandatory respondents received rates between 2.5% and 10.5% over their overall sales. So the rate difference is 5% to 20%, I mean 5% to 20% times. Correct. The rate that Commerce assigned was 5% to 20% times different. But the majority of the sales that Commerce used in its preliminary decision for purposes of corroborating the shrimp, which Commerce has always, throughout this entire proceeding, treated as a very special and very particular type of shrimp product that it does not use in its normal comparisons for anti-dumping countermeasures. Are those the broken shrimp? Yes, Your Honor, but I'm hesitant to say that because that was one of the confidential issues. Well, it's out there. I'm not going to say the specific numbers, but I understand that Commerce based the 57% rate on a very small number of transactions. Correct. And out of sort of the large volume, I mean far less than 1%, for example, of transactions. 19 out of nearly 10,000. Oh, I wasn't going to say the numbers. I'm going to say the numbers. I mean, if it's not part of the record, it ought to be. Go ahead. I'd like to... Please respond to me. A couple days ago, the government submitted a case, PAM versus the United States, which was recently decided by this court, in which it also agreed that the actual number of outlier sales, the specific number, might not be relevant to a determination as to whether or not a decision by the government has substantial evidence. Really, I believe the facts of that case show that the real issue isn't a magic number or a specific threshold or percentage of sales that must be considered, but whether or not the sales are normal sales, whether they're representative, whether they are typical of the actual sales that were used to determine the adverse rate in the first place. But not all of the 19 sales were broken shrimp. Correct. And I think that's another aspect of the recent PAM decision and the dot-10 decision that it references that's important to identify, that the number of sales might not be relevant, but Congress makes this decision looking at the totality of all the sales. But again, we don't know. You weren't dumping broken shrimp. So how do we know it's wrong for them to use as corroboration a rate that pertains to a exact same kind of shrimp you were selling? But they are not using the sales of the broken shrimp to corroborate gallant ocean sales. They're using the sales of broken shrimp to corroborate the petition rate, which everybody acknowledges was not based on broken sales. It was not based. It was based on typical, normal sales by a usual Thai exporter during the petition, when the petition was filed four years earlier. The rate was based on shrimp covered by the anti-dumping duty order. And the duty order, as I understand it, doesn't distinguish between broken shrimp and non-broken shrimp. So the rate that they have to proffer in their petition has to be to apply to the shrimp that are being sold, right? The rate should apply to the various types of shrimp that are sold to the United States market. But the rate in the petition itself, that specific rate was not based on atypical shrimp product sales. It was specifically based on normal commercial quantities, normal products in the normal price ranges in order to demonstrate a particular margin that existed for purposes in the sheeting of the case. It was not based on what we are claiming to be very atypical, very unusual, very rarely sold shrimp that were sold in a small amount by the mandatory response. But not all of them are those atypical shrimp of the 19 or however many it was that they based it upon. That's true. But Commerce stated in its final decision that they are not solely relying on the sales of atypical shrimp for purpose of their margin. But that means that they are relying on those sales to some degree. You know, Commerce didn't use the one really outrageous dumping margin. They threw that out for you. I mean, gosh, under Ta-Cheng and Pam, if they really wanted to be tough, they could have probably tried that one and tried to justify it under Ta-Cheng and Pam, which both relied on a single instance. And actually Commerce itself has never explained why it threw that sale out. Probably because it was so outrageous it was, you know, nearly 100 times the margin. Well, and that gets to our point that you need to corroborate the adverse petition rate with reasonable rates that are made by other mandatory response during the period. And who's to say that... There was no corroboration in Ta-Cheng because that was their own sales, right? Correct. Corroboration is not an issue... That's a little off the point of what you're arguing, corroboration. Correct. How about Pam? In Pam, I believe that the Commerce Department decided and the courts affirmed that the 29 sales that Commerce reviewed as transaction sale to be representative and thus be reliable and relevant and demonstrate that the adverse rate continued to have probative value. I don't believe anyone object to those 29 sales, but I am objecting to the sales that Commerce picked. And although... But you're objecting to all of them and the only rationale you've given is that some of them involve broken shrimp. Why are you objecting to the other ones? I'm objecting to Commerce's decision that the adverse rate was corroborated by the totality of all of these sales. That these six broken shrimp sales were included in the 19 sales and that... Okay, that still leaves 13 sales and given the precedent like Ta-Cheng and Pam, where a very small number, even one sale could be the basis. I think one of the things that Ta-Cheng indicated and what was reiterated in Pam is that although in Ta-Cheng the facts allowed one sale to be sufficient for corroboration purposes, one sale was not the threshold and one sale might not be the threshold in other cases. And to me, that means that five sales or 10 sales or 20 sales might not be the threshold. Are you complaining that sales of other companies besides yours were used and that yours weren't used? Is that part of the problem or not? No, that's not an issue. It's really whether or not the sales that were used sufficiently corroborated the adverse rate used by the... Yes, since you didn't cooperate, you couldn't have your own. Correct. Do you want to save your rebuttal? Yes, please. Ms. Dunsmore, I'm not even going to let you start. I'm going to ask you, how do you reconcile a 5 to 20 times rate as being not punitive or aberrational or uncorroborated? Our law has always said you have a lot of discretion, but it can never impose a punitive, aberrational, or uncorroborated rate. 5 to 20 times? Your Honor, the rate was the rate in the petition and was based... It's not punitive? It's not punitive because it's based upon actual sales by the mandatory respondents. In the Japanese market? Well, as Mr. Gosling explained, at the time, there were no comparable sales from the Thai market and no party has... Couldn't you have gone anywhere other than Japan? Respectfully, Your Honor, I believe that's within the discretion of commerce and the petition. Yeah, but you've got to corroborate its applicability to the Thai market. The Japanese market is the strongest and most expensive fish market in the world. I understand, Your Honor, but I believe that is a question for the petition. No, you have to answer it because this is looking punitive to me, which is against our law. I understand. And so I'm trying to figure out if you've exceeded whatever discretion you're entitled to under Ta-Cheng and PAM. Respectfully, Your Honor, the Department of Commerce and the Department of International Trade has upheld similar rates before. Even if they are more than the rate of the actual respondents, that's a benefit that they receive because they participate in the process. If the party... Let me read from Martino, another one of our cases, where it says, yes, when they don't participate, they're in a little bit of trouble, but it says you still have to have a reasonably accurate dumping margin with some built-in increase. I understand. So you get an increase, maybe two times, maybe even three times, but 20 times? How can you convince me that you made a reasonably accurate effort to get the dumping margin when everybody else is in the 3% to 5% range and you hit them with nearly 60%? Is that reasonably accurate? The petition rate was compared to the industry import statistics when it was first applied, and then they looked at actual sales. But you had actual sales from all these cooperating shrimp producers that were in the 3% to 11% range. Now, why couldn't you have started there and even doubled it? And I don't think we'd have had any consideration here, but 20 times? You get some built-in increase, but reasonably accurate with some increase, not punitive. Respectfully, the statute provides that commerce may rely upon the petition and then corroborate it. And given that they relied upon the petition and corroborated it with actual sales, it is not a punitive rate, Your Honor. The actual sales, as we've discussed here, come out of Japan and include broken shrimp, which already looks to me like you're making a distinct effort to punish not to find a reasonably accurate rate. If you were looking for a reasonably accurate rate, you could have gone to the cooperating shrimp producers and then had some built-in increase above that. Any way you can justify not doing that? It's not what the statute requires commerce to do. The statute requires a reasonably accurate with some built-in increase. Where's your reasonable accuracy here? Respectfully, because it was based on the rate that arose from the import statistics and was corroborated by actual sales, and then between the preliminary and the final review, commerce went back after Gallant raised concerns and looked at the volume of those sales. It's reasonably accurate because it's based on actual sales data from the period of review. 19 out of 10,000. Is that reasonably accurate? This Court has upheld less. In the Ta-Cheng case, it was one sale. We have upheld less. Obviously, in those cases, we didn't perceive that there was a prospect of punitiveness or a lack of reasonable effort to get the accurate number. In Ta-Cheng Council, isn't it the case that the one sale was based on was one of their own? If you had had previous Gallant data, and I realize it's bad to fault commerce when it's Gallant that wasn't compliant or cooperating, but if you had had previous Gallant data that showed that sometimes they dumped at 57%, like in the Ta-Cheng case, it doesn't seem quite as punitive. Perhaps the record is silent as to whether Gallant had actually participated previously. Commerce was left with the information it had before it. Is commerce free to choose a rate less than 57%? I know that's what was in the petition. But suppose commerce said, well, the petition suggested rate just is not realistic. It's unreasonable. It's unreasonably high. Is commerce free to assess a different rate, like a 20% rate or a 30% rate? I just don't know how it works. First, when the petition rate is proposed in the petition, commerce examines it at that stage and determines based on whether this cooperating data supports the rate. In fact, the 57 rate here was the rate as adjusted. But suppose commerce found that the 57% rate is not supported by the data, that the data doesn't support more than, say, 20% or 25%, with a kicker for noncompliance kind of thing. So if commerce were to make that determination, would commerce be free to then put a 20% to 30% rate upon the non-cooperating folks? I'm saying, is it all or nothing? If they reject the petition rate, what rate gets applied? In selecting the adverse factor available rate, commerce can rely on a number of different sorts of information. They can rely on the petition, a final determination in an investigation, a previous review, or any other information placed on the record. So they're not bound by the petition, but they may, under the law, use the petition. So to answer your question, it doesn't have to be the petition, but it's legally permissible and the statute provides that they may, provided they corroborate it, which is what they did here. Did they have other options besides what they did use to corroborate it with? I mean, did they look for other sources? Were there no other sources? What happened? It's part of a large review. I'm sure, Your Honor, that there were other sources, but the question, Mr. Gosling seems to want to change the burden on commerce and add an additional review requirement. They are merely required to formulate a rate that's supported by substantial evidence and in accordance with the law, and they are allowed to rely on the petition, and that's what they did here. So there may have been other information in the record, but that's not what they chose to do, and what they chose to do was permissible. So just out of curiosity, do you think that they're dumping at a 57% rate all the shrimp they're bringing in? I don't know, Your Honor, because I don't know. They submitted no information. Now, Section 1677E says that you can use any independent sources that are reasonably at your disposal. I think this is kind of pursuing the question that Judge Wilken asked you, but you had a lot of other sources other than the petition, didn't you, that were reasonably at your disposal. You had the cooperating shrimp producers, which were at a 3% rate, many of them. You had markets other than Japan. I'm trying to figure out why you... Are you required to go to the petition, which, of course, you can imagine will be seeking the highest rate possible, anything to limit the competition? No, Your Honor, they're not required to, but they are permitted to, and it was legally permissible for them to do so. But you're also required to not punish, and you're required to not have aberrational rates, and you're required to do something that's reasonably accurate. How do you get reasonable accuracy out of something that's 20 times the rate imposed on others? Respectfully, Your Honor, the rate was... Because the rate was based on actual sales data from the period of review, we believe that the rate is reasonably accurate. There were sales that transpired in this time period that happened at that rate. It is a real rate. It existed. And for all we know, Gallant was... 19 sales out of 10,000. Do you think those could have been aberrational? They resulted in a 20 times rate. Sounds to me like that's pretty aberrational. Again, Your Honor, this court sustained... Not only was there only one sale in the Ta-Cheng case, but it represented a small... That was their own sale, though, wasn't it? Because they submitted information. You didn't even have to corroborate it for that reason, so we're kind of in a different category with Ta-Cheng. Well, I understand, but again, the Pan case was also a small volume of sales. The Department of Commerce looked and conducted a volume review of those sales and saw they were not atypical volumes, and it is... But they used a lot of their... Pam's own data to corroborate that, which is also a distinction, isn't it? Yes, well, again, it's unclear from the record whether there was any data from Gallant to corroborate. But you certainly had at your disposal a lot of other independent sources, didn't you? Yes, Your Honor. If you have no further questions, we would ask that you affirm the findings of the trial report from the Department of Commerce. Thank you, Ms. Dunsmore. Mr. Gaselink. In the remaining time, I just wanted to respond to your particular question about even if we throw out some of these unusual, atypical, broken sales of shrimp, there are still a few sales left over that Commerce used for corroboration purposes. And what about them? Why are they perhaps not sufficient for purposes of determining that the adverse rate was reliable or relevant or continuing to be probative four years after the fact? I'd like to mention, as we identified in our brief, that of those remaining 13 sales, seven of them were identified by Commerce in its final results only by referral to the quantity and the margin. And Commerce identified those sales in no other way. And so even though I have discussed those sales as being used for corroborating purposes, I have no idea, and Commerce does not provide any indication as to what those sales actually were. They might also have been atypical or unusual sales, just like the packed food sales that I'm asking the Court to consider should be excluded for purposes of non-representativeness. So if we exclude those seven sales and maybe those six sales, down we're down to even a smaller number. And at a certain point, as the PAM Court decided, the substantial evidence is not heavy, but it's not ephemeral either. Commerce has to go back and look to see whether or not the sales we now have remaining in terms of corroboration are sufficient for determining whether or not the adverse petition rate... Wait a minute, am I getting it right that you're actually trying to use PAM and suggesting it supports you? I mean, in PAM it was half of one percent. I mean, that's really, wow. You're claiming somehow that PAM is helpful to your case? PAM, I believe, represents the idea that whether or not corroborating sales are sufficient depend on the facts of each individual case. And whether one sale might be sufficient in Da Qian and 29 are sufficient in PAM, the PAM Court also said that in some cases one sale is not sufficient. Okay, in PAM the average was between 4 and 5 percent, right? The average? Correct. Okay, and so based on half of one percent of all sales, they assessed a 45.49 percent rate, a rate that was ten times as high based on half of one percent of all sales. And we affirmed. How did you get daylight between that decision and your case? I think the key issue is whether or not the sales in that case were representative. Not whether they were outliers, but whether the corroborating sales were representative of the adverse rate. In that case, no one objected. No one claimed that they were unusual, atypical sales. In this case, there is absolute evidence on the record showing that the sales Commerce used for corroboration are not the type of sales that they used in the petition. And that Commerce, from the very beginning of this proceeding, has established very special methodologies for calculating dumping margins involving this special type of shrimp. Okay, so tell me one more time, though, so I understand your argument. So the anti-dumping duty order covers both broken shrimp and regular shrimp. That's correct. And the rate that gets applied henceforth to the three cooperating companies, well, it's not the same rate for each one, but the rate that gets applied to each of them applies regardless of whether they're going to be dumping regular shrimp or broken shrimp, correct? The deposit rate on an ongoing basis will apply to those particular companies at those rates. And the rate that's going to apply to you all, the non-corroborating companies from now on going forward, applies whether you're selling broken shrimp or regular shrimp? That's correct. Okay, and in fact, you could be selling 100% broken shrimp for all we know, correct? That's correct. So why in the world can't Commerce rely since broken shrimp and regular shrimp are going to be covered by the same rate at all times, and since they're both covered by this anti-dumping duty order, and since we have no idea what you're selling, why isn't one of the adverse facts that they're allowed to find that all, why can't they just say, well, look, to further justify this, I mean, their view is it doesn't matter whether you're selling regular or broken, but to further justify it as an adverse fact, we assume that every dumping, every shrimp you sell here is broken. What's wrong with that? They could have done that, but they didn't. They chose the petition rate as the adverse rate, and the petition rate is the thing that was selected to apply to both broken shrimp and regular shrimp. It was selected to apply to broken shrimp and regular shrimp on an ongoing basis, but Commerce is not corroborating that rate with sales of entirely typical shrimp. They are using... Why do they have to use entirely typical shrimp? The rate is going to apply to both broken shrimp and non-broken shrimp,  Maybe they would corroborate some kind of a mix then, wouldn't they? I still believe that they should not use sales of an atypical product to verify or substantiate or corroborate sales of a typical product. How do we know which is typical? Our time has expired. Would you please respond to Judge... I'm sorry? How do we know which is typical? Commerce has announced in its determination that the petition rate is based on typical products. It is based on normal products sold in an ordinary course of business. And you're assuming that means not broken? Correct. I'm declaring that that is absolutely the case, that Commerce has never indicated that that rate includes any broken shrimp whatsoever. Okay. Thank you, Mr. Koselink. Our next case is Zelenka v. OPM. Thank you.